Thank you for the opportunity to address the Court today and hopefully elucidate some of these issues that appear to be in need of clarity or a resolution of conflict. I'm also honored to be joined in this inquiry with the Inveritable Dean of the Cockbriar Park. Can you speak a little louder? Yes, Your Honor. I'd like to briefly set a little bit of context for where we are at. We are trying to apply the rules set forth in Apple Computer and in Three Boys Music on substantial similarity and inverse ratio rule. And also taking a searching inquiry towards some of the plain meaning of the statute regarding derivative words. In a context, and pardon me, Your Honor, if I cite to a case that is not mentioned in the briefs, but the recent Supreme Court case of Algeret in which affirmed the extension of the copyright amendments for the elongation of the limited term of protection for authors. And in it, the Court reaffirmed the strong philosophy of protection in an age, in a post-industrial age, in which America is in large part a supplier of software, of entertainment, of artistic goods around the world. And I think that it's important to put that in context. And a little bit of irony here as well, that the opponent in this case, DreamWorks, was founded on the proposition of being writer-friendly, and based on the idea that high concepts have considerable value in the entertainment world. And I think that one of the issues we can address, we can look directly to what DreamWorks says in its film. And it says, based on a story by Leslie Cockburn and Andrew Cockburn, and also says at the end of the credits that there is no allusion or reference to any historical figure in terms of character or event. This is not a nonfiction story. Now, I'd like to address first, Your Honor, the issue of preemption of the implied contract issue. Because I think that this is the first case for the Ninth Circuit to squarely address this issue. We think that the evidence for what the Congress intended does not support what DreamWorks is saying. Disney v. Wilder was a very strong part of the entertainment law aspect of this country, far out in other states. And certainly a strong point of view for half a century in the state of California, leading up to the Capitol. There's nothing in legislative history that indicated that Disney v. Wilder doesn't finish the overall. Indeed, we have a situation, a case, a scrabble case in which we have a situation in which there's not enough copying or protectable expression to constitute copyright infringement. But yet the court did find that there is a breach of implied contract within that framework. And I think that that is one issue that the circuit should follow the lead of the other circuits. And finding that in the Wrench case, for example, that we do not have any sort of preemption with respect to an exclusive remedy because you have an extra element. You have a contractual relationship, the kind of relationship that was identified by Justice Treanor in the Columbia case and also reiterated in the Disney v. Wilder case. Excuse me, go ahead. I was going to ask you a question about the letter that was not accepted by the district court because the district court denied the motion to amend. Let's say this case ended tomorrow. Would the statute of limitations have run for you to file a fresh action based on that letter? I would say not, Your Honor. I think that it would be part of the nucleus of facts that pertain to the original filed action. I don't believe we should have to file a new action. That's not my question. My question is if you had to, would the time have run? No, Your Honor. In terms of the ‑‑ So I would ask, I suppose, your opponents to address the question why they're fighting so hard because you can raise it here or you can raise it separately. I guess I don't see what the gain is on their part then. Well, with respect to the letter as a copyright issue, I don't understand either, Your Honor, because as a matter of right's judicata, it cannot be applied because their whole theory is that if it's not properly before the district court, the registration certificate for that letter, then by definition it's not a claim which could have been brought at that time. Therefore, it's not raised judicata. We're not precluded from filing another action. And whether they're right or wrong as a matter of judicial estoppel, they wouldn't be able to raise raised judicata in a second action based on a letter. That's correct, Your Honor. Okay. But it does get us involved a little bit in the merits of that in terms of procedurally how should we go about doing it. One way we can address it is by whether the denial for the request for leave to amend was an abuse of discretion. And I think under these circumstances, there's been no prejudice because there is no discovery that it was done. And therefore, we take the most important issue, I think, is their argument that it was futile to address the letter. And I don't see in light of the chart. Well, with respect to the items that are in the record excluding the letter, what in your view are the most important elements that create a factual issue for a jury with respect to substantial similarity? We know it can't just be general plot ideas. We know it can't just be general character ideas. What are the specific developed elements, fictional elements, that you think would allow a finding of substantial similarity? Well, first of all, the basic plot premise of smuggling a nuclear backpack weapon in a diplomatic pouch through to New York to go to the U.N. to atone in a distorted terrorist mine. Was the U.N. in, I forget now if it was in the novel. It was in the treatment. Okay. It was in the treatment. Okay. Go ahead. And with respect to that, there are various characters which were referenced in Red Bull Rising. The Colonel, the friendly Colonel, the dynamic between the lead character, the irreverent brash Green Beret, and as well as the daughter of the Colonel, which was referenced also in the movie in the hearing, with respect to sending the jeep, the vehicle over. There are a number of elements, and we can trace them by the chart by referencing the page references and excerpts of record which do not correspond to the letter citations, and they are numerous. What you don't have, and their point is I take it, that you don't have it in a linear sequence placed as well as in the letter. I think their position also is that the elements, at least taken singly, are generic, that you can't copyright a brash Green Beret, for example. Other people can have that character without filing a copyright. Well, here is the error in their filtration analysis, and this relates I think also to an observation made in the Apple Computer case. When you talk about Sins Affair, you have to have an evidentiary basis for it. You have to have something in the record, we believe, that says this is the prior art, so to speak, to use an analogy from Patton Lafield, this is the prior novel, this is the prior treatment, this is Rambo or it's not Rambo, and give the opportunity to the plaintiffs to draw a distinction. The plaintiffs did have expert testimony regarding whether there was an adequate precedent in the literature of novels and literature of films. They had Mr. Moore, they had a film critic, and they went through this. The other side presented nothing. So there's no opportunity to cross-examine that. In Apple Computer, what Microsoft did is they had a video describing what the competitors did out there in terms of sequencing their windows and filing their windows. There's evidence in the record in Apple Computer. Well, that went to a slightly different point in Apple Computer. I mean, the thing here is if you start with a generic idea or you start with some historical facts and you put a little gloss on them, is the gloss something that just naturally follows from the idea, such that it's not protectable? Okay. And then there would have to be something to inform that judgment, Your Honor. Well, yes, by reading all of the submissions, by looking at the allegedly infringing work, by looking at the identified list of similarities, extracting from it what's protectable, filtering out what's unprotectable. That's correct, Your Honor. And seeing what's left. And when you do all that, as the district court did, fairly painstaking way, one is left with the abiding conclusion that the works are just totally dissimilar. Well, Your Honor, we have to interpret the meaning of the statute based upon. That's the litmus test for determining whether a work is a derivative work, whether they have permission. Well, now, the derivative work thing comes up in the reply brief for the first time. So it seems to me what we're looking at is just in an ordinary copyright infringement sense, whether the eight, I think it's eight, submissions excluding the 1994 letter, are substantially similar to Peacemaker in protectable elements. All right. What I would address in that aspect, Your Honor, is that in order to determine, as the district court mainly relied upon two principles, and they were affirmative defenses, they were historical fact, merger, and sins of error. They had the duty to present evidence in support of that affirmative defense. They didn't provide any evidence. Before that, I mean, I'm sorry, Mr. Sillais, since I'm the culprit, obviously. I'm kind of ‑‑ I don't understand exactly what they failed to do that Apple says that they should have done. Well, sins of error, as we mentioned, Apple Computer said that there's reference sometimes needs for expert testimony. Yeah. They made a reference to the video played by Microsoft there to help explain sins of error. The Jackson case referred to ‑‑ But you have everything here in front of you. I mean, you don't have a licensing issue here like you had in Microsoft about the derivation of the graphical user interface. I mean, I don't understand what more the defendants would have done other than put on Peacemaker and say, okay, look at it and read the submissions and look at your comparison tape, all of which I've done, all of which we've all done. And so what I'm looking to you to do is to explain where it is specifically that there are protectable elements that create a triable issue of substantial similarity. Your Honor, with respect to ‑‑ let's just take, for example, the first aspect, which is the retribution for an attack by U.N. or NATO against a Muslim and the retribution in terms of smuggling a nuclear backpack weapon obtained from a crumbling Soviet human empire and to bomb the U.N. and to be saved through the efforts of a rogue character, Green Beret. You go through the list of all those items, and there's nothing in the literature that they evidence in the record below which says any of those plot sequence points were manifest anyplace else. And here's what the problem we have in not having discovery go forward on this issue to basically test Sen's affair. We know from what's in the record that the film itself says that it was based upon an article by the Cockburns. That's the statutory language of focusing on derivative works and the infringement of derivative work is based upon. We have, in essence, an admission that the film works knows how to calibrate what is based upon for giving credit. Now, if we examine what the district court summarized that article, an article that appeared well after the fact, we know that that could not possibly have been the source of it. There was a page and a half treatment which the district court summarized which did come three months after the Idema Spielberg letter. And if you look at those elements, they are just a portion, a portion of the elements that are on the chart. And yet it was sufficient enough for them to put credit on the film to say it was based upon. And I think this is an area in which, Your Honor, actions speak louder than words, so to speak. If, for example, one-fifth or one-sixth of the story propounded by the plaintiffs, which was in the page and a half Cockburn treatment, was enough to instigate the movie and lead to credit of based upon, a fortiori, something five times more than that, is enough to constitute infringement of the right to make derivative work. Now, the issue is someone may say there's a lot of differences. Well, then we look to that in the allocation of damages. That's how we handle that issue. And the importance of that outline of the basic sequence of events is extremely important. There's a Frank Musick case on the Kismet Review done in Las Vegas. And there the court, at the appellate level, reversed the finding of 25% attributable to the basic concept sequence of events and said it should be 75%. In the case which I regret we didn't cite, but the Campbell... I'm sorry, the rear window case, which Mr. Petrich is very familiar with, there they said there was 20%, perhaps, of the basic sequence that was used in the movie, and that was enough. And this is what I think we were precluded from showing in discovery, is to say how that process came about, that they evaluated in their expertise, as their own experts, they came up with a point of what was based upon. And if you look at the page-and-a-half summary by the district court of that treatment by the Cockburns, you don't even have the DeVoe character in there. You don't even have them going to the UN. You don't have them going to New York. All you have is the basic idea that smuggling weapons out of the Soviet Union, falling into the hands of a terrorist in Eastern Europe, would create a lot of problems. And if we would have had a discovery, and I would profit this, Your Honor, in good faith, it's not in the record, but if there had been discovery, perhaps, I'll say hypothetically, maybe there might be disclosure that that page-and-a-half treatment would have led, within two hours of it being faxed, to the acceptance of that, to the Cockburns being co-producers. And maybe we would have found out that Mr. Spielberg, hypothetically, was the source of the DeVoe character. I mean, this is a very unusual case. This is a case in which it's not about access, it's not about the opportunity to review, it's not even about reading it, which is what the Bochco case was about, and they considered that was access. This is where there was an admission that they had it, and they actually used it. And to me, this is extremely important in terms of the derivation issue. And I want to save a little bit of my time on that, because I think that there's an issue that you raised on Arnstein v. Porter, which I think is relevant to this case. Okay. I'll call it in. Why don't we hear from Mr. Petrich, and then we'll get back to you. Good morning, and may it please the Court. I am Louis Petrich, appearing for the DreamWorks Defendants. I intend to show four things. That the plaintiffs' attempt to amend their complaint on appeal to state a claim for copyright infringement based on a 1994 letter comes too late. But even if it were allowed, the judgment would still have to be affirmed. Second, that as a matter of law, the movie The Peacemaker is not substantially similar to any protected expression in any of the eight registered works, or as I said, even in the letter. Third, that the concession of access for purpose of getting a ruling where the works themselves are just compared with one another has no bearing on whether the works are substantially similar in their protected expression. Fourth, that I think Mr. Pizzulli tried to raise the notion that somehow the test for showing that the Section 106.2 right to make a derivative work should have a different standard than substantial similarity he talks about based upon. And let me take that one. I'm sorry. I have a question about number two, which seems to me to be the pivot of the case as it's come forward to us up until today. The question of substantial similarity. And even filtering out the unprotectable elements, because of the procedural posture of this case, we still have to look at the facts and the light most favorable to the opposing party to you. And with that standard in mind, I don't understand how we get away without a jury in this case, why there isn't a jury question about similarity in view of the concession of access. Your Honor, there have been probably six or eight cases affirmed in this court where access was assumed. And I've been in several of them. Certainly the Litchfield v. Spielberg involving the motion picture. Birgate v. Crichton involving the movie Coma. A case decided. Well, I understand your point. It can be done. It can be done. Your Honor, excuse me. It was done in effect. It was done in two cases where access was found as a fact. In fact, copying was determined as a matter of fact. Judge Reimer in the Apple computer case. Copying was not challenged. The question is whether what was copied was protected expression. And whether in all of these cases, especially where you have a claim not of piracy where you can show there was something taken in total word for word, but non-literal similarity, you always have to ask yourself when we compare the two works at the level of expression or at the level that the plaintiff claims there is a taking, are we talking about ideas? Are we talking about scenes of fear? Are we talking about general plot ideas? In some respects, that would seem to be the case. But what about some of the details like the can destroy ten city blocks and other specific details that are fictional elements, they're very specific and they appear to be in both works or one of the works on one side and the peacemaker on the other? First of all, we're not told that they're fictional. We're told and I think they come out of Jim Morris' treatment and some of them come out of the Soldier of Fortune articles and those statements are made as matters of fact, they're not made as matters of fictional items. The other problem is we have to also be careful that we aren't aggregating all eight works and comparing them to one because what they're claiming is at least at one level, they're claiming that they have a specific arrangement that gives them copyright ability of what otherwise are unprotectable matters. And what they're doing is cherry picking from the A's. They will look ten city blocks. The district judge pointed out in three other occasions they talked about other kinds of damaged areas. They talked about 50 blocks. They talked about a third of a mile, I think it was. So there really isn't anything to be made of that and in any event, it's not expression. They aren't claiming that dialogue was taken. That's an idea that a bomb can take out a number of blocks. And what is going on when we talk about things like that? So it sounds like what you're saying is if they have a claim at all, it's a destiny kind of claim. That would probably be the best claim they would have and I'll go to that. I don't think they have that claim either. I have one sort of question for my own interest only and that is whether the parties have engaged in any attempt to settle or mediate this dispute either through our mediation services or otherwise. We've talked to the mediator of the Ninth Circuit and we've also – well, the parties haven't but the attorneys haven't. We've made the same offer that was made by the other defendants who were recently dismissed waiver of attorney's fees. So the point I'm trying to make is that if you look at them at the level at which the plaintiff claims there has been a taking, what you see is abstractions or ideas or scenes of fear. And I know counsel says that the judge should have had an evidentiary hearing on the scenes of fear issue. But let's look at what the scenes of fear were that she found. She found that in a case where you're talking about smuggling nuclear weapons out of a country, that it's a scene of fear that you'll come to a border or to a checkpoint and that you might have a skirmish at the border or checkpoint. I think that's self-evident. I don't think you need to have an evidentiary hearing. She says that in a case where you are talking about a story and, after all, this is all fact-based, the notion that when the Soviet Union fell apart, there wasn't adequate security of these nuclear weapons and there was a great concern that they would be smuggled out of the country. She says that it is a scene of fear that when you smuggle out of Russia, you'll probably run into Iraq or Iran because they're on the border. That was one of the scenes of fear. And, of course, the standard in this circuit for scene of fear is not that it has to happen every time, but simply that it is something that flows naturally from the plot premise. And we have a major concession here by the plaintiff's expert, Mr. Whitmore. He said that in a case where you have a promise that the works were, I'm sorry, that the works are about a failed effort to take a nuclear weapon from Russia to the United States, that in his words the, I'm sorry, he says, from a story premise about a nuclear theft and almost successful terrorist act, quote, the sequence of events is dictated by this premise, end quote. We cite that in our answering brief at page 31 of 41. I think that's probably a little extreme because I don't think every incident is dictated by it. But certainly the kind of incidents that you're going to have, they can be strung in different ways to tell a different story. And here the stories are quite different. Plaintiff's story, whether you go to the letter or whether you go to his eight works, are all about how he goes to Lithuania and takes up with this fellow who's the head of the police force, and they chase the smugglers around and they find out there's nuclear smuggling going on. Then he comes back to the United States. That's not in our movie at all. And there he gets in trouble with the FBI. He says he was framed and the FBI put him in prison. That's not in our movie. And then he's sprung, in some versions of the story, he's sprung from prison and he goes back to Lithuania, and there they chase the smugglers down to Iraq. In our movie we go to Iran. The smugglers are stopped around Azerbaijan. And then in some versions of his story they chase the terrorist, who he's described as a world-class terrorist. Ours is a piano teacher who is also a member of the Bosnian parliament. And he smuggles nuclear weapons into the United States, and there's a big dispute about whether the nuclear weapons are even alike. They have so-called backpack weapons that are made for that purpose. In ours it's a trigger for a nuclear weapon that is carried with a backpack. In theirs, the smuggler has great contact with the Middle East terrorists. He supposedly has dinner with all of the terrorists and they're named Abu Nidal and Yasser Arafat, etc. And using PLO connections, he gets the backpack device into JFK. In ours, the man is a member of the UN delegation and he gets it into the airport. In some versions of theirs, the story ends at the airport. There's a fight and the Green Beret shoots the terrorist in the airport contrary to instructions from the White House. In ours, the terrorist proceeds to Manhattan and he's not shot, he shoots himself. But he's carrying this nuclear trigger and it's disarmed by Julia Kelly. So what has happened is in both works, in all of the works, you have people using the general building blocks for a story about nuclear weapons and smuggling and terrorism and a threat in the US. And I should point out again, by aggregating their works, they've covered a lot of territory. They have potential use of this weapon at the World Trade Center. They talk about blowing up bus stations. They talk about other places in Manhattan and they talk about the UN. So they've kind of covered the major points in the major entry into the United States, New York. So, but ultimately what's protected is at least, I would say, three levels. You have the story level where you're talking about the pattern of the characters, the character relationships, and the essential sequence of events. And this circuit has said many times that when you're looking at the sequence of events, you don't juxtapose them out of order because it's the sequence that is the arrangement that is protectable. And that's what you compare. And they could also, I suppose, try to look at specific scenes like the scene of the confrontation of the smugglers at a checkpoint or a border. But they're quite different. You have to look at the details because it's the details, not the idea that's protected. In this case, depending on which of the eight versions you take, they have a confrontation at the border leaving Lithuania. They go west, by the way. We go south. In Lithuania, they have this confrontation at the border where they send two cars ahead. They have two trucks, and they have people, in one version anyway, it takes 50 pages in Red Bull Rising, and they have people in the woods waiting, and then they have a shootout, and they go in, they kill all the guards, and then they go into the barracks and kill everybody in the barracks, in hours. The bad guy, Kordov, I guess it's Kordov, has one truck disguised as a Red Cross truck. He's stopped. The guard becomes suspicious, and he shoots the guard, and then they shoot the other couple of guards that are standing around. They're all done completely different, and as Judge Collins said, it's not very surprising that if you're smuggling weapons out of a country, you're going to cross a border or a checkpoint, and you're probably going to have a confrontation if it's going to be a drama. If you don't have a confrontation, maybe it's a different kind of story. As far as the characters go, the rule in this circuit is quite clear. It's very difficult to claim protection for word-picture characters that are described. The most likely situation where characters are protected are either where the character tells the story itself, in a sense, Mr. Idema might be that. If what you're focusing on is his problems with the U.S. government and that kind of thing, maybe that's the story, but that's not our story. In fact, in practice, the only time characters are protected in and of themselves usually is where they have some particular unusual physical presence or guard. It started out they protected comic book characters, Superman, because he had a cape, and Wonder Woman, and so on. Over time, there have been some who have very distinctive things about them, such as James Bond, because we have a series of works, and if you copy all the accoutrements around him, maybe he's protected. But we don't have anyone like that. Now, as far as the concession of access for sake of argument, as I said earlier, we've got the Litchfield case, the Burkitt case, Cavalier, just last year, Koof, another movie case, Murrell, a case involving the use of historical work to write a fictional work. All of them assumed, for sake of argument, that there was access. All of them, the court was able to determine whether or not there was any taking of protectable expression. We have several cases where copying is established. Feist, in the U.S. Supreme Court, the telephone directory case. Everybody agreed they copied. They copied it verbatim. So if they had infinite access, why did they have to put on any showing of substantial similarity of protected expression? Because the U.S. Constitution and free speech requirements mean that copyright can, the accommodation between copyright and free expression is inherent in the idea of expression dichotomy. And for that reason, the circuit in Croft and the U.S. Supreme Court in Harper and Rose said, you have to make sure de novo whether or not we are properly enforcing that line between idea and expression. It can't be done casually. Yes, Your Honor. Counsel, I want, before you close, I want to take you back to the problem of the letter as to whether the district court abused its discretion in not allowing an amendment. As I understand it, Adema was still acting pro se at that time. He was, Your Honor, but he was acting in concert with co-owners. He had argued that that letter was owned jointly by him and the three other plaintiffs who all had counsel. All their papers were filed as a joint filing. Counsel filed the papers, and Mr. Adema also filed. If we were to find that we should be more tolerant because Adema was acting pro se and were to send it back to admit the letter, we might be into a situation where the case would have to go forward with discovery and go forward with trial. It seems to me that there's a bit of need, possibly, to reconsider mediation and settlement in this case. Well, we're not opposed to it. It just hasn't happened, Your Honor. But one of the things that I think has to be noted is that this case had a history. Mr. Adema and the other parties were given a year's notice that they had to register whatever they sued on. It's a jurisdictional requirement. Subject matter jurisdiction can't be obtained in a copyright case by a party unless there's registration. It was never pled as a copyright case. They always pled the letter in the third, fourth, fifth, sixth causes as an idea submission case. They did it tactically. We pointed out that in our motions that led up to the summary judgment and the motion to dismiss, they argued to the court that there could be no preemption of their idea submission case under the letter because it was not copyrightable. There's a judicial estoppel there. At least some point, the district judge should be able to rely on what's submitted to the district court. There's also, counsel, I guess, the issues of whether the state court actions should have been dismissed. There may still be an issue of breach of confidentiality as to the letter, question of contract that may not be preempted. There are a lot of kind of messy issues floating around here. Well, I think if you look at the contract case, one thing that stands out is it's only against three parties, and one of them has recently been dismissed, Mr. Peterson. That leaves you DreamWorks. There is no allegation that they had a contract with DreamWorks. The letter was sent to Amblin, which is not a party, and addressed to Mr. Spielberg, who is a party, but there's no allegation that they did satisfy the preconditions for creating a contract with Mr. Spielberg because there was no chance for him to say, I don't want your letter. They just sent it to him, and they tried to impose liability by putting the word confidential on the letter. I think my time is up. I'm sorry I didn't get to the preemptive issue. If you have any questions about it, I'd be glad to do it. All right. Thank you. Thank you. Mr. Priscilli. None of those cases that were cited by counsel, there's evidence or admission of actual copying, which is what we have here, the use of materials sent to Mr. Schiffer, the party admission obtained from him, party admission obtained from Mr. Peterson. And let's also talk about, briefly, the filtration analysis. At any level of abstraction, if you consider going up high and high enough to the level of abstraction, everything or nothing, I should say, is original. It all goes back to Genesis. That's not what we do in these kind of cases. We use a sense of judgment. Let's look at the counterfactual in this case. Let's look at what they described their film to be, and then, as we did in our reply brief, we X'd out elements that came from IDEMA. And what did they have left? They did not have enough to constitute the first film for DreamWorks, a message film sent by Mr. Spielberg and Mr. Katzenberg, the author of the famous film about high-concept films. This was a high-concept film. You have to take it in context. We didn't have the right to do discovery. We would have shown, we believe, Your Honor, the nexus between Mr. Spielberg and his use of the DeVoe IDEMA character, and the connection with this film. We were not allowed to do that. Now, what's interesting, in their brief, they talk about adopting the Arnstein v. Porter, the Second Circuit case. And it's very interesting, and I would commend the Court's attention to this. I did not do that in the reply brief, and I apologize for that. But if we look at the Croft case, the Croft case goes into Arnstein v. Porter and purports to follow it. And what's interesting is what they said, that once you get to a finding of actual copying, the issue of whether there has been unlawful appropriation, which is where they say the juncture we're at in terms of evaluating the effect of Sohn's Affair, is the proper criterion on that issue is not analysis or the comparison of respective compositions. They go on to say it's not an extrinsic dissection test issue. We are at the stage with the admissions that we have in this case of getting to the intrinsic level. And I think that's what Your Honor indicated is. The question is, why isn't this before the jury? We have gotten to that issue with their admissions. They were unrebutted. Unrebutted. This is not a situation. They were not pro se. They had all the access to the best experts in the world. And they couldn't come up with one iota of evidence, not one that said this was a prior art. This Idema story was not novel. And they can't. Because when you do the reverse filtration, you strip away the Idema story elements from their story as they characterize it, they have nothing but a shell left. And let's put it, let's take that just one step further, and I appreciate it if I could have another minute, Your Honor. Just wrap it up if you can. Let's assume the Peacemaker came first. And then there was a film based on the Idema letter, the Idema elements. Are they really going to say with a straight face that they had no claim for an infringement of the second work? And that's really the logical extension here. And that, I think, puts the objective test at issue. Thank you, Your Honor. All right. Counsel, thank you. Your arguments and other disargues will be submitted, and the Court will stand in recess for the day. This Court is in recessions and adjourned.
judges: B. Fletcher, Rymer, Graber